651 P.2d 944

**Anita R. FREIBURGHAUS,
Plaintiff-Respondent,**

v.

**Leland W. FREIBURGHAUS,
Defendant-Appellant.**

No. 13920.

Court of Appeals of Idaho.

Sept. 21, 1982.

Petition for Review
Nov. 15, 1982.

Mark L. Clark, Kibler, Hamilton & Clark, Nampa, for defendant-appellant.

Bruce O. Robinson and Randolph E. Farber, Bruce O. Robinson, P. A., Nampa, for plaintiff-respondent.

SWANSTROM, Judge.

Plaintiff sued Leland W. Freiburghaus for divorce from an alleged "common-law" marriage. Leland contested the action, contending there was no marriage. The trial judge held that there was a marriage. He awarded Anita a divorce and divided the property and debts between the parties. Leland appealed, raising several issues. The principal issue is whether, under Idaho law, there can be a marriage, without a solemnization and where the parties did not reside together or hold themselves out publicly as being married. Because we hold the trial judge erred in deciding this issue, we reverse the decree of divorce.

This is the second appeal in the case. *See Freiburghaus v. Freiburghaus,* 100 Idaho 730, 604 P.2d 1209 (1980). The first appeal resolved only the issue of whether the magistrate hearing the case had jurisdiction to decide the controversy. The Supreme Court remanded the case to the district court in 1980. Magistrate Judge L. C. McClintick, who initially heard the case, became a district judge while the first appeal was pending. Upon remand he conducted further hearings as a district judge and entered the decree from which this appeal was taken by Leland.

Anita was seventeen years old when she met Leland, who was then thirty-eight. When Anita was eighteen in 1968, the parties traveled to Phoenix, Arizona, where, according to Anita's testimony, they privately exchanged wedding vows at a friend's home. Only Anita and Leland were present when the vows were said.

Leland denied that there was any exchange of vows. He admits only that he and Anita were intimate friends for several years. He testified that he considered marrying Anita and finally proposed marriage in March, 1977, only to be met in reply by Anita's complaint for divorce.

Leland testified that he was a minister, ordained in a church at Kingman, Arizona, before he met Anita. Leland, a deeply religious person, claimed to have seen and heard both Jesus and God—Jesus on many occasions. Anita testified that Leland's directions governed many aspects of her life, including what jobs she would hold and when they would have sexual relations. Anita asserted that Leland greatly influenced her by stating that God's will would not be done unless she acted in a specific manner. Leland, according to Anita, said that it was God's will that no one would learn they were married. He insisted the marriage be kept secret from everyone.

The trial judge found indicia of a marriage relationship. His findings, however, include the following:

> They have maintained separate, though nearby, residences; have not introduced each other as husband and wife; have not owned property jointly; have not maintained joint bank accounts; and have not filed joint tax returns. She used her maiden name for business and social purposes. She went along with him in these matters, hoping the day would come when they would acknowledge their marriage publicly.

During the trial, several friends and acquaintances of the parties testified. Without exception the testimony of these persons was that Anita and Leland did not have the reputation of being married. They were thought to be close, intimate friends.

Although there was nothing in writing and no corroboration to support the exchange of vows, the trial judge accepted Anita's testimony and found there was an oral civil contract of marriage, following which the parties mutually accepted the rights, duties and obligations of marriage. Only Anita's testimony—contradicted by Leland—supports this finding. The findings of the trial judge, where supported by substantial though conflicting evidence, cannot be set aside. *Fowler v. Uezzell,* 94 Idaho 951, 500 P.2d 852 (1972). On appeal the evidence must be viewed most favorably toward a respondent and against an appellant. *Cahill v. Logue,* 93 Idaho 533, 537, 466 P.2d 573, 577 (1970). Therefore, the finding of the trial judge regarding the exchange of vows will not be set aside.

The judge also held that the lack of a reputation of marriage did not preclude a finding that there was a marriage. He found the lack of such a reputation to follow logically from their efforts, at Leland's instance, to keep the marriage secret. The judge concluded that a reputation of marriage is not essential for the creation of a common-law marriage.

There are two forms of marriage authorized in Idaho. One is a marriage that is solemnized by a person authorized to perform marriages, witnessed, authenticated, with a certificate recorded, as provided by I.C. §§ 32–301 through 32–309. The trial judge found, "[t]here was no evidence of a solemnized marriage with a license" between Anita and Leland.

Idaho, as part of a dwindling minority of states, also continues to recognize "common-law" marriages. This recognition is embodied in the following statutes:

I.C. § 32–201. Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties or obligations.

I.C. § 32–203. Consent to and subsequent consummation of marriage may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases.

These statutes predate statehood in Idaho. They are identical to former 1877 R.S. §§ 2420 and 2422.

The Idaho Supreme Court recently has summarized the present law regarding proof of a common-law marriage under I.C. § 32–201. In *Metropolitan Life Ins. Co. v. Johnson,* 103 Idaho 122, 645 P.2d 356 (1982), the court suggests that the trend toward abolition of common-law marriages indicates an obvious hostility towards the doctrine. Even courts of states recognizing the doctrine view it with disfavor. To discourage common-law marriage claims, many jurisdictions impose stringent evidentiary burdens on the party seeking to establish a "common-law" marriage. But Idaho does not. In *Johnson,* supra, 645 P.2d at 360–61, the court said:

In contrast with other jurisdictions, Idaho has never viewed the doctrine of common law marriage with disfavor. Together with a small number of other states, Idaho permits a non-ceremonial marriage to be proven by a preponderance of the evidence.... Once a common law claimant meets certain evidentiary requirements...a presumption as to the validity of the marriage arises which shifts the burden of producing evidence to the opposing party to show by clear and positive proof that the asserted marriage is invalid....

Under I.C. § 32–201, a marriage which is not solemnized requires the mutual consent of competent parties, followed by a mutual assumption of marital rights, duties or obligations. *Hamby v. Simplot Company,* 94 Idaho 794, 498 P.2d 1267 (1972).

It is established that the consent required by I.C. § 32–201 must be given when the parties enter into the contractual responsibilities of marriage. [Citation omitted.] That consent need not be manifested in any particular manner and no magic words are necessary but rather consent may be express or it may be implied from

the parties' acts and conduct.... Thus evidence of conduct by and between the parties consistent with the existence of a common law marriage may be probative of consent.

When persons having the capacity to contract have held themselves out to be husband and wife, and have gained that general reputation in the community, or where they acknowledge that they are husband and wife, a court may be warranted in drawing the inference that at the outset there was then present mutual consent between the parties to assume a marital relationship.

The prior decisions of this Court make clear that when a couple cohabit, assume the rights, duties and responsibilities of marriage, and hold themselves out as being married, a presumption of marriage arises which, if disputed, must be overcome by clear and positive evidence....

Here, Anita's proof did not establish cohabitation and a holding out by the parties themselves as being married. As noted above, the trial judge excused failure to prove cohabitation or a reputation of marriage because of Leland's influence over Anita. The judge concluded that the Idaho Code does not require marriages by mutual assumption of rights, duties, and obligations following consent, to be made public. We believe this conclusion is untenable in cases where, as here, the parties themselves dispute the existence of a marriage.

For many years, California recognized common-law marriages under laws identical to the quoted Idaho statutes. About 1895 the California legislature amended its counterpart to I.C. § 32–201, to require that all marriages be solemnized, and to stop what the California Supreme Court said "was becoming a public scandal and a reproach to the state...." *In Re Baldwin's Estate*, 162 Cal. 471, 123 P. 267, 269 (1912).

Early California decisions, dealing with former California Civil Code § 55, have often been cited by the Idaho Supreme Court in interpreting I.C. § 32–201. In *Hamby v. Simplot Company*, 94 Idaho 794, 796, 498 P.2d 1267, 1269 (1972), the Idaho Supreme Court, said:

Under a statute such as ours, a common-law marriage arises where "the consent of the parties capable of making it" is followed by "a mutual assumption of marital rights, duties or obligations." The existence of such a marriage may be established by evidence that the parties have acquired a uniform and general reputation as husband and wife. *In re Gholson's Estate*, 83 Idaho 270, 273, 361 P.2d 791 (1961); *In re Baldwin's Estate*, 162 Cal. 471, 123 P. 267, 275 (1912); *Hinckley v. Ayres*, 105 Cal. 357, 38 P. 735, 736 (1895); *Sharon v. Sharon*, 79 Cal. 633, 22 P. 26, 36–37, 131 (1889); *In re Svendsen's Estate*, 37 S.D. 353, 158 N.W. 410, 414 (1916); Annot., 33 A.L.R. 27, 44–45 (1924); *See Harron v. Harron*, 128 Cal. 308, 60 P. 932 (1900). On the other hand, the existence of such a relationship may be negated by evidence that the parties held themselves out as single persons rather than as husband and wife. *In re Gholson's Estate, supra; In re Baldwin's Estate, supra; Sharon v. Sharon, supra; see In re Jessup's Estate*, 81 Cal. 408, 425, 21 P. 976, 22 P. 742, 746, 1028 (Cal.1889).

In *Hamby* the Idaho court cited *Hinckley v. Ayres*, 105 Cal. 357, 38 P. 735 (1895). In *Hinckley*, 38 P. at pages 736–37, the court said:

There is no assumption [of marital rights, duties, or obligations] unless the parties live together as husband and wife, treat each other "in the usual way with married people," and so conduct themselves as to have full repute among their intimate friends and associates to be husband and wife....

When determining whether a man and woman were living together as husband and wife, we look mainly to those who knew most about the situation, who were the most intimate with them, who had the best opportunity to observe their conduct towards each other, and who knew best what their relation was reputed to be.

The same principle was followed in *People v. Lehmann*, 104 Cal. 631, 38 P. 422

(1894), and in *Kilburn v. Kilburn,* 89 Cal. 46, 26 P. 636 (1891). In *Kilburn* 26 P. at page 637 the court said:

> The mutual agreement of the parties to live together in the professed relation of husband and wife is essential to create a contract of marriage, and the contract, when made, imposes upon the parties to it the obligation to do so, and there can be no assumption or entering upon the discharge of such duty or obligation, as contemplated by section 55 of the Civil Code, without the cohabitation of the parties consenting to a present marriage. And by cohabitation is not meant simply the gratification of sexual passion, but "to live or dwell together; to have the same habitation, so that where one lives and dwells there does the other live and dwell also." *Yardley's Estate,* 75 Pa.St. 207. This was in effect so held in *Sharon v. Sharon* 79 Cal. [633], 670, 22 Pac.Rep. 26, 131. . . .

*See also In re Baldwin's Estate, supra,* cited by the Idaho Supreme Court in *Hamby.*

▮ Under the rules set forth in the Idaho decisions, and in the California cases cited with approval by the Idaho Supreme Court, we hold that to make a *prima facie* showing of a marriage, Anita's evidence must have established not only consent, but also mutual assumption of the rights, duties and responsibilities of marriage, by cohabitation and by holding themselves out to the community as husband and wife. Only then would Leland have to overcome the presumption of a marriage by providing "clear and positive proof" to the contrary. We think there are good public policy reasons why there ought to be a close adherence to requirements for establishing a marriage under I.C. § 32–201, especially where the existence of the marriage is disputed.

Because Anita's proof was insufficient to make a prima facie case, we conclude the trial judge erred in determining there was a marriage. Therefore we reverse and remand the case for entry of a judgment consistent with this opinion. No costs or attorney fees on appeal.

WALTERS, C. J., concurs.

BURNETT, Judge, specially concurring.

I join in the result and in the court's conclusion that cohabitation and a "holding out" of marriage are among the elements that must be proved to establish the existence of a disputed "common-law" marriage. I hesitate to embrace the entire analysis leading to that conclusion because the prior Idaho and California decisions, cited with approval by the court, leave some doubt concerning the nature and effect of the "presumption" of a valid marriage.

Occasional references in those cases, and in today's decision, to "overcoming" the presumption suggest that the presumption is evidentiary in nature. However, in my view, the presumption is not evidence itself; it is not a substitute for evidence; nor does it assist a party who asserts existence of a marriage in making a prima facie case. Rather, the presumption is an expression of public policy favoring marriages, which enhances the weight accorded to a prima facie case. The presumption shifts the burden of persuasion to the party denying the marriage—once a prima facie case has been made—and requires that the quantum of evidence disproving a marriage meet an elevated standard which has been variously termed "clear and convincing," "clear and positive," or "cogent and satisfactory." Today's opinion, where it discusses the parties' respective burdens of proof in this case, is consistent with my view of how the presumption operates.

The result reached by the court is consonant with sound public policy. Marriage confers important benefits, and imposes substantial burdens, which are legally enforceable. The compulsion of the law, and the finite resources of our courts, should not be invoked upon the disputed assertion of a secret marriage, unsolemnized and unaccompanied by any conduct indicative of a marital relationship. It is not too much to ask that persons who seek to enforce marital burdens and benefits demonstrate compliance with the relatively lenient requirements of Idaho law for establishment of a marriage.